## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KATHLEEN PETERSON, | ) | 3:21-CV-332 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF WATERFORD, | ) | |
| *Defendant*. | ) | March 31, 2023 |

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

In this employment action, Plaintiff Kathleen Peterson alleges that her employer, the Town of Waterford, Connecticut ("Defendant" or the "Town"), interfered with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and retaliated against her for taking leave under the FMLA. Defendant seeks summary judgment on both of Plaintiff's claims. For the reasons described below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

### I.      FACTUAL BACKGROUND

Unless otherwise noted herein, the parties agree on the following facts. At all relevant times, Plaintiff has been employed by Defendant, a municipality in the state of Connecticut. Ans., ECF No. 10, ¶¶ 2, 7–8. Defendant's town charter vests the executive authority of the Town in a Board of Selectmen, except to the extent such authority is granted to the Town's First Selectman. Pl.'s Local Rule ("L.R.") 56(a)2 St., ECF No. 33-2, ¶ 1.[1] The First Selectman is supported by an

---

[1] Plaintiff takes issue with Defendant's submission of the affidavit of Robert Avena, Defendant's Town Attorney, who she claims Defendant failed to properly disclose. The Court has reviewed Avena's affidavit and finds the averments therein to be inconsequential for purposes of the present motion. Indeed, Defendant concedes that the affidavit "merely provides background information," "is not the sole source of such evidence," and "cannot be deemed significant." ECF No. 38 at 3. Accordingly, because the affidavit would not change the outcome of the Court's ruling on the present motion, the Court need not decide whether it should be excluded.

executive assistant;[2] the executive assistant position is a confidential, nonunion position that serves at the pleasure of the First Selectman. *Id.* ¶ 3.

In 2009, then-First Selectman Daniel Steward encouraged Plaintiff to apply for the executive assistant position, which had become vacant. *Id.* ¶ 8. At that time, Plaintiff and her husband were social friends with Steward and his wife. *Id.* ¶ 9. Plaintiff applied for the executive assistant position and was subsequently interviewed by Steward and the Town's Human Resources Director. *Id.* ¶ 10. Steward hired Plaintiff for the executive assistant position, and she began working for the Town on January 26, 2009. *Id.* ¶ 12.

In November of 2019, Robert Brule was elected to succeed Steward as the Town's First Selectman. *Id.* ¶ 13. Defendant asserts that, due to Brule's private sector experience, he wanted the executive assistant to operate in a manner akin to a chief of staff; in other words, he wanted an individual who could assist him with transitioning into office and provide him with the necessary support to implement his administration's agenda. Def.'s L.R. 56(a)1 St., ECF No. 29-2, ¶ 15. Plaintiff denies this assertion but, in doing so, she cites only to a portion of her own deposition testimony in which she claimed that Brule told her, "I want you to stay if I get elected." Pl.'s L.R. 56(a)2 St. ¶ 15. Following Brule's election, Plaintiff continued to serve as his executive assistant for a period of time. *Id.* ¶ 14.

Defendant further asserts that, within a couple weeks of being sworn into office in December of 2019, Brule began voicing complaints about Plaintiff's job performance to Joyce Sauchuk, who was serving as Defendant's Human Resources Director at that time. Def.'s L.R. 56(a)1 St. ¶ 16. Defendant asserts that Brule immediately noticed a lack of organization within the First Selectman's office and that Plaintiff could not ascertain basic information for him. *Id.* ¶

---

[2] The parties sometimes refer to this position as the "executive secretary" position. For purposes of consistency, the Court will refer to the position as the "executive assistant" position.

18.   Defendant further asserts that Brule continued to raise concerns about Plaintiff's job performance on an almost weekly basis.  *Id.* ¶ 17.  Plaintiff denies each of these assertions; in doing so, she asserts that Brule testified that he made notes and sent emails commenting on Plaintiff's job performance, but these notes and emails do not exist.  Pl.'s L.R. 56(a)2 St. ¶¶ 16–18.  She further asserts that the notes and emails do not exist "because Brule had no concerns with [Plaintiff's] job performance and did not express any such concerns to Sauchuk," but she cites no evidence to support this assertion.  *Id.*  Plaintiff also contends that Brule never told Plaintiff that he was dissatisfied with her performance.  *Id.* ¶¶ 17, 18.

Defendant claims that Brule perceived several other deficiencies in Plaintiff's job performance.  First, in late 2019, Brule requested that Plaintiff update a list of the cell phone numbers of each of the Town's Department Heads; despite Sauchuk offering Plaintiff suggestions about how to compile the updated data, Human Resources personnel, rather than Plaintiff, ultimately updated the list.  Def.'s L.R. 56(a)1 St. ¶ 19.  Plaintiff denies this allegation, averring that Human Resources personnel placed a permission lock on the list and that, because Sauchuk could not give Plaintiff access to the file, she offered to update the list herself.  Pl.'s L.R. 56(a)2 St. ¶ 19.  Defendant also claims that Brule was concerned about the informality of Plaintiff's business interactions, including because Plaintiff called at least one Town official "honey."  Def.'s L.R. 56(a)1 St. ¶ 20.  Plaintiff does not deny that Brule heard her call an elected official "honey" when signing off on a phone call, but she avers that Brule did not take exception to her use of the term and instead laughed at her mistake.  Pl.'s L.R. 56(a)2 St. ¶ 20.

Defendant further claims that, at or around the time of Plaintiff's phone call incident, Plaintiff was routinely receiving personal Amazon packages at her office, and that Brule spoke to her about this practice; Plaintiff denies that she had such packages delivered.  Def.'s L.R. 56(a)1

St. ¶ 21. Defendant also asserts that Plaintiff was frequently observed using her personal cell phone during work hours. *Id.* ¶ 22. Plaintiff does not deny the substance of this allegation, but she claims that she used her cell phone to make updates to the Town's website because a firewall was installed on Defendant's computers after a security breach; she further claims that when she informed Brule about this reason for using her cell phone at work, he said "okay." Pl.'s L.R. 56(a)2 St. ¶ 22.

Defendant contends that Brule found Plaintiff's work product lacking sufficient attention to detail, that she presented final drafts with typographical errors and misaligned margins, and that she used various forms and templates for the same work product, Def.'s L.R. 56(a)1 St. ¶ 23; Plaintiff denies each of these allegations, Pl.'s L.R. 56(a)2 St. ¶ 23. According to Defendant, Brule also noticed that Plaintiff was failing to provide him with all pertinent information about missed telephone calls and that she was unable to distinguish between matters that should be elevated to the First Selectman and matters that should be handled at lower levels of Town government. Def.'s L.R. 56(a)1 St. ¶ 24. Plaintiff denies Defendant's allegations about how she handled phone calls, averring that, after Brule instructed her to stop putting voicemails through to his extension, she began to write out messages and place them on her desk in an organized fashion. Pl.'s L.R. 56(a)2 St. ¶ 24. She further avers that, because Brule would sometimes miss her paper messages, she would send him email and text message reminders. *Id.*

Finally, Defendant asserts that, despite the highly confidential nature of the executive assistant position, Brule believed that Plaintiff was not keeping confidences. Def.'s L.R. 56(a)1 St. ¶ 25. Brule purportedly based this belief on information being discussed around Town and among Town employees, and Defendant asserts that this impacted Brule's ability to speak freely or candidly about business affairs without fear of discussions being leaked. *Id.* Plaintiff denies

that she failed to keep information confidential or leaked any confidential information.  Pl.'s L.R. 56(a)2 St. ¶ 25.

Defendant contends that, in late 2019, and early 2020, Brule had numerous conversations with Sauchuk, Defendant's Town Attorney, and Defendant's labor counsel, all of whom confirmed to him that the executive assistant position served at the pleasure of the First Selectman and that he had the discretion to choose the person serving in the position.  Def.'s L.R. 56(a)1 St. ¶ 26. Defendant further contends that, in December of 2019, Brule decided to replace Plaintiff as executive assistant, and informed Sauchuk of that decision.  Id. ¶ 27.  Plaintiff does not dispute that Brule had hiring and firing authority, but she denies that Brule had discussions about replacing Plaintiff due to job performance concerns and that she had any performance issues.  Pl.'s L.R. 56(a)2 St. ¶¶ 26, 27.

On or about March 17, 2020, after the COVID-19 pandemic commenced, Plaintiff began taking paid leave to care for her adult son, who suffers from a physical disability.  Id. ¶¶ 28–29. Plaintiff informed Defendant of this paid leave in person.  Id. ¶ 29.[3]  Brule informed Sauchuk of Plaintiff's leave, and the reason for Plaintiff's leave was determined to be an FMLA qualifying event.  Id. ¶ 33.  The Town sent Plaintiff notice that her FMLA leave was approved, as well as a "Designation Notice."  Id. ¶ 34.  Plaintiff initially sought leave from March 17, 2020, until April 1, 2020, but she requested an extension until April 13, 2020, which the Town approved.  Id. ¶ 35. Plaintiff then sought an additional extension of leave until May 1, 2020, and ultimately returned to work part-time on May 4, 2020.  Id. ¶ 36.  Upon her return, Plaintiff worked Tuesdays and Thursdays until May 20, 2020; all other weekdays were considered "intermittent" FMLA leave.

---

[3] Previously, while working at Mindscape Industries in Norwich, Connecticut and serving as Second Selectman, Brule hired Plaintiff's son, who worked for Brule through a high school transitional program and, subsequently, as a full-time employee.  Pl.'s L.R. 56(a)2 St. ¶¶ 30–31.  Plaintiff's son had a positive experience working for Brule.  Id. ¶ 32.

*Id.*  Plaintiff's last day of FMLA leave was May 20, 2020.  *Id.* ¶ 38.  It is undisputed that the Town approved all of Plaintiff's requests for FMLA leave in 2020.  *Id.* ¶ 39.[4]

When she returned to work on May 4, 2020, Plaintiff returned to her position of executive assistant to the First Selectman.  *Id.* ¶ 37.  On that very day, however, Brule informed Plaintiff that he intended to change the nature of the executive assistant position and referenced the need to have the role filled by someone with a different skill set.  *Id.* ¶ 40.  Plaintiff asserts that Brule told Plaintiff that he did not know what skills he was looking for, but he wanted somebody who could work weekends and nights.  Pl.'s St. Add'l Facts, ECF No. 33-2, ¶ 2.  She further asserts that Brule told her that he had not raised changing the position with Human Resources, and that he was going to put together a job description and review it with Plaintiff but never did so.  *Id.* ¶¶ 2, 3.[5]  Between May 5, 2020, and September 1, 2020, neither Brule nor Sauchuk spoke to Plaintiff about the executive assistant position or her potential removal from it.  Pl.'s L.R. 56(a)2 St. ¶ 41.  Plaintiff asserts that Sauchuk told her that her job was not in jeopardy and that the changes to the executive assistant position had nothing to do with her performance.  Pl.'s St. Add'l Facts ¶ 5.

According to Defendant, at some point in 2020, Brule requested that Sauchuk find Plaintiff an alternative position within the Town that had health insurance benefits because he knew the importance of such benefits to Plaintiff.  Def.'s L.R. 56(a)1 St. ¶ 42.  Plaintiff denies this assertion, claiming that it was Sauchuk who made an effort to find Plaintiff a position with health insurance benefits in September of 2020.  Pl.'s L.R. 56(a)2 St. ¶ 42.  She further claims that Brule stopped in Sauchuk's office and told Sauchuk about a "data tech" position, and that Sauchuk responded that Plaintiff would have questions about benefits.  *Id.*

---

[4] Plaintiff was also granted FMLA leave in 2013, and she made no complaints against the Town concerning that leave or her return to work.  Pl.'s L.R. 56(a)2 St. ¶ 56.

[5] Plaintiff testified that she understood that the written job description could not officially be changed unless approved by a "Personnel Review Board."  Pl.'s St. Add'l Facts ¶ 4.

On September 2, 2020, Brule informed Plaintiff that he had found an alternative position for her within the Town and presented her with the job description for the union position of Data Technician II in the Town's Police Department. *Id.* ¶ 43. On September 8, 2020, Plaintiff met with Sauchuk and Brule and, during that meeting, they made clear to Plaintiff that she would not be allowed to remain in the executive assistant position. *Id.* ¶ 44. Plaintiff testified that Brule told her that she was not a good fit for the position but never specified the skills he believed she lacked, despite her asking what she could do to improve. Pl.'s St. Add'l Facts ¶¶ 7, 11, 21–22.[6] She further testified that Sauchuk told her that her options were to take the Data Technician job or leave her employment for the Town. *Id.* ¶ 8.[7]

Later on September 8, 2020, Sauchuk presented Plaintiff with the job description for the Community Safety Educator ("CSE") position in the Town's Fire Department and discussed that position with her. Pl.'s L.R. 56(a)2 St. ¶ 45. The CSE position is designated as a part-time position, with the CSE working 21.25 hours per week. *Id.* ¶ 46. These hours normally do not meet the threshold to qualify for health insurance or continued participation in Connecticut's Municipal Employees Retirement System ("CMERS"), a pension program. *Id.* On September 10, 2020, however, Sauchuk informed Plaintiff that the Town had consulted with its insurer and CMERS and determined that it would be able to offer Plaintiff health insurance benefits and continued

---

[6] Moreover, Plaintiff takes issue with the validity of statements Brule purportedly made about her during the September 8, 2020, meeting, including his purported complaints about Plaintiff's inability to work on the Town budget and perform social media work. *See* Sauchuk Dep. Tr., ECF No. 33-6, at 75:16–76:17. Plaintiff asserts that she performed social media work for Brule, updated the Town's and the First Selectman's website, was responsible for training new employees about the Town's website, and never declined to do work related to the Town's website or social media. Pl.'s St. Add'l Facts ¶¶ 13–17. She further asserts that she knew the Town's budgetary process and worked on the Board of Selectmen's budget each year. *Id.* ¶¶ 29–30.

[7] Plaintiff claims that, on September 3, 2020, she told Sauchuk that she had asked Brule to meet weekly to discuss what he needed from her so that he would be a successful First Selectman. Pl.'s St. Add'l Facts ¶ 23. She claims that Sauchuk responded by saying that it sounded like Brule was preventing her from succeeding at her job. *Id.*

participation in the pension program.  *Id.* ¶ 47.  On September 11, 2020, Plaintiff accepted the CSE position, effective September 21, 2020.  *Id.* ¶ 48.

Although the CSE was to work 21.25 hours per week, Plaintiff was told—and understood—that, if the Fire Department's budget had unspent appropriated funds, she could work additional hours in a given week; Plaintiff in fact worked such additional hours.  *Id.* ¶ 49.  On or about October 28, 2020, Brule requested that Department Heads not propose operating budgets for the 2022 fiscal year ("FY2022") that included increases over the previous fiscal year's operating budgets.  *Id.* ¶ 50.  The Fire Department's proposed FY2022 budget sought an increase of nearly 10%, which included increasing the CSE position's hours from 21.25 to 28 hours per week.  *Id.* ¶ 52.  Defendant's Finance Director cut the proposed increase in CSE hours because the Fire Department's primary objective at the time was to expand fire protection coverage for overnight hours and this required increased personnel cuts.  *Id.* ¶ 53.  Nonetheless, it was still understood that, if money was available in the Fire Department's budget, Plaintiff could work more than 21.25 hours per week, and Plaintiff continued to work additional hours.  *Id.* ¶ 54.

From the time Brule took office in November of 2019, until the time Plaintiff accepted the CSE position, neither Brule nor Sauchuk made any statements that portrayed a critical view of her use of FMLA leave.  *Id.* ¶¶ 59, 60.  Moreover, Plaintiff never told Sauchuk that she believed her use of FMLA leave motivated Brule's desire to replace her as his executive assistant.  *Id.* ¶ 58.  In 2020, twenty-four Town employees went on FMLA leave; Plaintiff is the only one of these employees who has claimed she suffered an adverse action upon returning to work.  *Id.* ¶ 57.[8]

---

[8] Plaintiff alleged in her complaint that Fred Conley, a Board of Education courier, went on FMLA leave during the COVID-19 pandemic and, when he returned, Defendant cut his hours from full-time to part-time.  Compl., ECF No. 1, ¶ 66.  In connection with the present summary judgment motion, however, Plaintiff admits that Conley was not on FMLA leave in 2020.  Pl.'s L.R. 56(a)2 St. ¶ 55.

Plaintiff commenced this action in March of 2021, alleging claims for FMLA discrimination and retaliation (Count One) and interference with the exercise of her FMLA rights (Count Two).  Defendant now moves for summary judgment on both counts.

## II.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at

324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).  "[O]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### III.    COUNT ONE:  RETALIATION

In Count One, Plaintiff alleges that Defendant retaliated against her by demoting her from executive assistant to CSE.  As set forth below, the Court denies Defendant's request for summary judgment on this claim.

#### A.  Legal Standard

The FMLA provides "broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family."  *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017).  Under the FMLA, an eligible employee is entitled to take up to twelve weeks of leave to care for a son or daughter if that son or daughter "has a serious health condition," 29 U.S.C. § 2612(a)(1)(C), and the employee is entitled to reinstatement to her former position or an equivalent position at the end of her leave, *id.* § 2614(a).  The FMLA defines a serious health condition as "an illness, injury, impairment, or

physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a healthcare provider." *Id.* § 2611(11).

It is unlawful for any employer to either "interfere with" the employee's exercise of her FMLA rights or retaliate against an employee who exercises her FMLA rights or opposes any practice made unlawful by the FMLA. *Id.* § 2615.  Relevant to Count One, retaliation claims under the FMLA "involve an employee . . . exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by [her] employer." *Woods*, 864 F.3d at 166.  The Court analyzes such retaliation claims under the burden-shifting framework the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation, *Woolf v. Strada*, 792 F. App'x 143, 145 (2d Cir. 2020) (summary order); *See Hockenjos v. Metro. Transporation Auth.*, No. 14-CV-1679 (PKC), 2016 WL 2903269, at *6 (S.D.N.Y. May 18, 2016), *aff'd sub nom. Hockenjos v. MTA Metro-N. R.R.*, 695 F. App'x 15 (2d Cir. 2017) (summary order); this burden has been described as "*de minimis*," *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 72 (D. Conn. 2014). To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish that (1) she "exercised rights protected under the FMLA"; (2) she "was qualified for [her] position"; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429. Adverse employment actions include "materially adverse change[s] in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices unique to a particular situation," as well as "refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Powell v. Dep't of Educ.*, No. 14-CV-2363 (PKC)(SLT), 2018 WL 4185702, at *6 (E.D.N.Y. Aug. 30, 2018) (alteration in original) (quoting, in part, *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006)).

If the plaintiff establishes her *prima facie* case, "the defendant must demonstrate a legitimate, non-discriminatory reason for its actions." *Graziadio*, 817 F.3d at 429. If the defendant does so, "the plaintiff must then show that [the] defendant's proffered explanation is pretextual." *Id.* The plaintiff "may satisfy this burden by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason, or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a motivating factor in the adverse employment action." *Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order) (internal quotation marks omitted) (citing *Graziadio*, 817 F.3d at 430, and *Woods*, 864 F.3d at 168–69). The "ultimate burden" of persuading the trier of fact that the defendant retaliated against the plaintiff "remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *see also Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (recognizing a plaintiff's ultimate burden of proving that retaliation caused the adverse employment action), *abrogated on other grounds by Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

B. <u>Discussion</u>

The Court denies Defendant's motion insofar as Count One alleges that Defendant retaliated against Plaintiff by removing her from the executive assistant position.[9]

---

[9] Plaintiff's complaint also alleged that she was retaliated against based on Defendant's refusal to increase the CSE position's hours in the FY2022 Town budget. Plaintiff has not briefed this issue in opposing summary judgment, so the Court deems it abandoned.

Defendant does not contest that Plaintiff has established the first three prongs of her *prima facie* case—i.e., that she exercised rights protected under the FMLA, was qualified for her position, and suffered an adverse employment action.  Thus, the only issue in dispute as to Plaintiff's *prima facie* case is whether she was removed from her position under circumstances giving rise to an inference of retaliatory intent.  In seeking to establish the final prong of her *prima facie* case, Plaintiff relies exclusively on the temporal proximity between her FMLA leave, Brule's statement of his intention to replace her, and her ultimate removal from the executive assistant position.  For the reasons below, the Court finds that Plaintiff has raised an inference of retaliation for purposes of her *prima facie* case.  The Court further finds that, although Defendant has set forth a legitimate, nonretaliatory reason for removing Plaintiff, Plaintiff has raised genuine issues of fact material to whether this reason is pretextual.

a.   Plaintiff's *Prima Facie* Case

In the Second Circuit, a plaintiff "can raise an inference of retaliatory intent 'by showing that the protected activity was closely followed in time by the adverse employment action.'"  *De Figueroa v. New York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) (quoting *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *see Hill v. N.Y.C. Hous. Auth.*, 220 F. Supp. 3d 499, 508 (S.D.N.Y. 2016) ("Temporal proximity between a plaintiff's exercise of rights created by FMLA and adverse employment action can give rise to an inference of retaliation.").  Although the Second Circuit "has not drawn a bright line to define the outer limits" beyond which a temporal relationship is "too attenuated to establish a causal relationship" between a protected activity and an allegedly retaliatory action, *Gorman-Bakos*, 252 F.3d at 554, it has noted that courts in this Circuit "have typically measured that gap as a matter of months, not years," *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012).  A court

must therefore "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). Importantly, in the Second Circuit, "time periods greater than one year have been found, in general, to be insufficient" to establish a temporal relationship. *Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 125 (D. Conn. 2007). By contrast, "[w]ithin the time period of one year, there is no firm rule" and, under certain circumstances, temporal proximity of up to eight months has been deemed sufficient. *Id.*

Under the circumstances of this case, the Court finds that the temporal proximity between Plaintiff's taking of FMLA leave and her removal from the executive assistant role is sufficient to establish an inference of retaliation for purposes of her *prima facie* case. On May 4, 2020, the day Plaintiff returned to work from FMLA leave, Brule told her that he intended to change the nature of the executive assistant position and discussed needing someone with a different skillset. Pl.'s L.R. 56(a)2 St. ¶ 40. Then, just over four months later, on September 8, 2020, Plaintiff met with Sauchuk and Brule, at which time they made clear that Plaintiff could not remain in the executive assistant position. *Id.* ¶ 44. On September 11, 2020, Plaintiff accepted the CSE position, effective September 21, 2020. *Id.* ¶ 48. Thus, Brule suggested that Plaintiff would be removed from her position on the very day she returned from FMLA leave and removed her from her position approximately four months later.

Although Defendant cites case law suggesting that temporal proximity of more than two months is insufficient to create a causal nexus between a protected activity and an adverse employment action, this is not a bright line rule. Rather, as noted, the Court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity" in the context of this particular case. *See Summa*, 708 F.3d at 128. And, of course, at summary judgment,

the Court must draw all reasonable inferences in favor of Plaintiff, the nonmovant.  Here, it is undisputed that Brule raised his intention to alter the executive assistant position in a manner that would lead to Plaintiff's removal *on the very day* she returned from FMLA leave.  This undisputed fact supports Plaintiff's argument that her demotion was related to her FMLA leave, and the Court must view this evidence alongside the four-month temporal proximity between Plaintiff's return from leave and her ultimate removal from her position.  On this record, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has offered sufficient evidence to establish her *prima facie* case of retaliation.

Defendant makes the secondary argument that, by expressing his dissatisfaction with Plaintiff's performance, Brule began taking gradual adverse job actions against Plaintiff before she requested FMLA leave; the Court is unpersuaded, however, that the evidence Defendant cites is sufficient to defeat Plaintiff's *prima facie* case.  To be sure, it is the law of this Circuit that where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity," an inference of retaliation does not arise.  *Lamitie v. Middlesex Hosp.*, 380 F. Supp. 3d 197, 208 (D. Conn. 2019) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001)).  Thus, for example, where unsatisfactory reviews or negative work evaluations began before a plaintiff engaged in protected activity, she "must adduce some grounds for an inference of retaliation besides temporal proximity."  *See Spaulding v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3041 (KAM) (VMS), 2015 WL 12645530, at *46 (E.D.N.Y. Feb. 19, 2015), *report and recommendation adopted*, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015); *see also Jain v. McGraw-Hill Cos.*, 506 F. App'x 47, 48–49 (2d Cir. 2012) (summary order) (where the record "conclusively demonstrate[d]" that defendants "repeatedly warned" plaintiff about work performance and "made

the decision to terminate [her] for performance reasons before she took FMLA leave," temporal proximity was insufficient to create material issue of fact on retaliation claim).

But, here, Defendant cites only averments and testimony from Brule and Sauchuk—its own agents—to support its argument, and Plaintiff disputes that any concerns were ever communicated to her in a manner suggesting that Brule was seriously dissatisfied with her performance. Defendant has produced no written evaluations, internal memoranda, or even informal emails demonstrating that the alleged performance concerns were either documented for Brule's and Sauchuk's own files or discussed with Plaintiff, despite that Sauchuk testified that Brule repeatedly confirmed that he was documenting any performance issues. Sauchuk Dep. Tr. at 94:19–95:22. This action is therefore distinguishable from cases in which, for example, performance critiques were communicated to a plaintiff or otherwise documented before the plaintiff engaged in protected activity. *See, e.g.*, *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 582 (S.D.N.Y. 2010) (plaintiff failed to establish causal connection where his "documented poor performance began significantly and sufficiently earlier" than his protected activity); *Dixon v. Int'l Fed'n of Accts.*, No. 09 CV 2839 (HB), 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) ("[The plaintiff] was subjected to repeated critiques and complaints about her management and performance skills before she ever lodged any complaints about discrimination and, as such, her retaliation claim must be dismissed."), *aff'd*, 416 F. App'x 107 (2d Cir. 2011) (summary order). In the absence of any documentation corroborating Plaintiff's alleged performance deficiencies, there is a genuine dispute of material fact concerning whether Defendant actually viewed Plaintiff as performing poorly; resolution of this dispute will turn on the credibility of Brule and Sauchuk, on the one hand, and Plaintiff, on the other.

Indeed, in each of the cases Defendant cites in support of its argument on this point, employers presented evidence of more than mere internal conversations—entirely outside of the plaintiffs' knowledge—to support their assertions that gradual adverse actions took place before the plaintiff's protected activity.  *See, e.g.*, *Slattery*, 248 F.3d at 95 ("[I]n this case the adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began when [the defendant] diminished [the plaintiff's] job responsibilities a full five months prior to his filing of the EEOC charges." (emphasis omitted)); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 263 (E.D.N.Y. 2012) ("Nor do the facts give rise to an inference of discriminatory intent, as plaintiff began receiving negative evaluations and letters to file prior to her application for her first FMLA leave."), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  Those cases therefore stand in contrast to the present action, in which Defendant's agents claim they *privately* discussed their dissatisfaction with Plaintiff's performance and her removal from her position, but can point to no records corroborating such concerns, and where it is undisputed that Defendant first indicated Plaintiff would be removed from her position the very day she returned from FMLA leave.

The testimony of Brule and Sauchuk may well be persuasive at trial on the issue of whether or not Plaintiff's FMLA leave factored into her removal from the executive assistant position.  But the ultimate persuasiveness of such testimony will necessarily hinge on assessments of the credibility of these individuals, weighed against the credibility of Plaintiff's averments, for example, that neither Brule nor Sauchuk communicated any concerns to her until she returned from FMLA leave and that Brule's issues with her performance are inconsistent with what occurred in the First Selectman's office.  At summary judgment, the Court cannot make such credibility determinations.  *See Kee*, 12 F.4th at 166 (noting that, "at the summary judgment stage,

the district court is not permitted to make credibility determinations or weigh the evidence . . . , for these are 'jury functions, not those of a judge'" (quoting, in part, *Anderson*, 477 U.S. at 255)).

The Court is likewise unconvinced by Defendant's argument that, out of twenty-four employees who took FMLA leave in 2020, Plaintiff is the only one who claims she suffered an adverse action.  In support of this argument, Defendant cites two cases in which district courts granted judgment for employers who terminated employees who took part in protected activity at or around the same time they terminated other employees who did not take part in protected activity.  ECF No. 29-1 at 18 (citing *Muhleisen v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 386 (S.D.N.Y. 2009), and *Monaco v. DXC Tech. Servs., LLC*, No. 18-CV-372 (RPK) (RML), 2021 WL 1723238, at *6 (E.D.N.Y. Apr. 30, 2021)).  Here, by contrast, Defendant does not claim that any other Town employees who did not take FMLA leave were, like Plaintiff, demoted; instead, it merely claims that twenty-three employees took FMLA leave without complaining about adverse actions when they returned to work.  But the fact that no other employees complained of retaliation does not mean, automatically, that Plaintiff was not retaliated against.  Accordingly, the cases Defendant cites are inapposite.

For these reasons, the Court finds that Plaintiff has satisfied her *de minimis* burden of establishing a *prima facie* case that her FMLA leave motivated Defendant's decision to remove her from the executive assistant position.

b.  Defendant's Legitimate, Nonretaliatory Reason

Because Plaintiff has established her *prima facie* case, the burden shifts to Defendant to articulate a legitimate, nonretaliatory reason for removing Plaintiff.  Here, Defendant has articulated such a reason—namely, poor job performance.  *See Chukwurah v. Stop & Shop Supermarket Co.*, 354 F. App'x 492, 496 (2d Cir. 2009) (summary order) (discussing the plaintiff's

"poor performance" as a "legitimate, non-retaliatory reason for firing him"); *Saad v. ASML US, LLC*, No. 3:19-CV-0135 (JCH), 2020 WL 12904711, at *7 (D. Conn. Sept. 4, 2020) (same). Relying on deposition testimony provided by Sauchuk and Brule, as well as Brule's affidavit, Defendant contends that Plaintiff's job performance suffered from several deficiencies, including lack of attention to detail, informality in business interactions, frequent cell phone usage during work hours, receipt of personal packages at the Town office, and lack of confidentiality. *See* Def.'s L.R. 56(a)1 St. ¶¶ 19–25. Accordingly, the Court finds that Defendant has carried its burden of articulating a legitimate, nonretaliatory reason for removing Plaintiff from the executive assistant position.[10]

### c. Pretext

Because Defendant has articulated a legitimate, nonretaliatory reason for removing Plaintiff from the executive assistant position, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for retaliation. Upon review of the record, the Court finds that Plaintiff has presented evidence of pretext that precludes summary judgment on this claim.

As a preliminary matter, Plaintiff conceded at oral argument that she has not presented any *direct* evidence that Defendant removed her from the executive assistant position because she took FMLA leave. Instead, her claim rests solely on two types of circumstantial evidence: the temporal proximity, discussed above, between her return from FMLA leave and her removal; and evidence purporting to show that Defendant's proffered reason for her removal is false. In other words,

---

[10] Although Plaintiff argues that Defendant's proffered reason is "not credible," the Court finds that the averments and testimony of Brule and Sauchuk are sufficient to carry Defendant's burden of production. The Court will address Plaintiff's arguments regarding credibility in its discussion of pretext below. *See, e.g.*, *Brophy v. Chao*, No. 17-CV-9527 (CS), 2020 WL 4040742, at *9 (S.D.N.Y. July 16, 2020) ("[A]llegations that an employer's justification shifted over time go to pretext, not whether the proffered justification was legitimate.").

Plaintiff seeks to avoid summary judgment through her *prima facie* case and evidence that Defendant's proffered justification is unworthy of credence, without more.

Under Supreme Court precedent, a plaintiff's *prima facie* case, "combined with sufficient evidence to find that the employer's asserted justification is false" *may* be sufficient to withstand summary judgment under the *McDonnell Douglas* framework. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir. 2000) (stating that "evidence satisfying the minimal *McDonnell Douglas prima facie* case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination" (italicization added)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). The Supreme Court "has indicated that only occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination but that such occasions do exist." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001). For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

The Second Circuit has made clear that *Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her].'"

*Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000).[11]  Thus, the Court must "examine the entire record and make [a] case-specific assessment as to whether a finding of discrimination may reasonably be made."  *Howard v. Port Auth.*, 771 F. App'x 130, 132 (2d Cir. 2019) (amended summary order) (alteration in original) (internal quotation marks omitted).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's *prima facie* case," the "probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case.  *Reeves*, 530 U.S. at 148–49 (italicization added).

Here, Plaintiff offers several reasons why, in her view, Defendant's assertion that she was performing poorly is a pretext for retaliation.  These reasons include that:  Defendant has offered shifting and inconsistent justifications for removing Plaintiff from the executive assistant position; Plaintiff worked in the executive assistant position for ten years without incident or discipline before Brule took office; there is no documentation of Brule's purported concerns regarding Plaintiff's job performance; Defendant did not follow its own policies for addressing performance issues when replacing Plaintiff; Defendant never formally changed the written description of the executive assistant position to reflect Brule's preferences; Brule's assertion that he was looking for someone with a different skill set is vague and subjective; and Defendant did not follow its standard hiring practices when hiring Plaintiff's replacement.  Although the Court has doubts about

---

[11] Although *Reeves* dealt specifically with a discrimination claim, it has routinely been applied in the retaliation context.  *See, e.g.*, *Faggiano v. Eastman Kodak Co.*, 378 F. Supp. 2d 292, 301 n.8 (W.D.N.Y. 2005) ("Though *Reeves* and *Schnabel* involve the Age Discrimination in Employment Act, the cases analyze the same *McDonnell Douglas* factors applied in retaliation claims, such as the one at bar."); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 205 (S.D.N.Y. 2009) (discussing guidance from *Reeves* in the context of an FMLA retaliation claim).

the independent persuasiveness of several of these reasons,[12] it finds that, after drawing all inferences in favor of Plaintiff, her evidence that Defendant has offered shifting and inconsistent justifications for removing her is just sufficient to create genuine issues of material fact as to pretext.

A plaintiff can show pretext "by demonstrating shifting reasons or inconsistencies in the defendant's proffered reasons for its action." *Sullivan v. N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 100 (S.D.N.Y. 2016) (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013)); *see Zimmitti v. Aetna Life Ins. Co.*, 64 F. Supp. 2d 69, 82 n.24 (D. Conn. 1999) ("Inconsistent explanations for a challenged employment action can be evidence of pretext.").  For example, in *Norville v. Staten Island University Hospital*, 196 F.3d 89, 98 (2d Cir. 1999), the Second Circuit concluded that the employer's "varying justifications" were "enough, albeit barely, to suggest pretext." *See also E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (based on the defendant's "inconsistent explanations for its decision" to terminate the plaintiff, "a reasonable juror could infer that the explanations given by [the defendant] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by [a] state investigation").

Here, the summary judgment record offers support for Plaintiff's argument that Defendant has provided shifting and inconsistent justifications for her removal.  First, Defendant concedes that, on May 4, 2020, Brule told Plaintiff that he was looking for an executive assistant with a

---

[12] For example, Plaintiff's argument that Defendant failed to follow its standard hiring practices when hiring her replacement seems more applicable to the *failure to hire* context than the *demotion* context. *See* ECF No. 33-1 at 38 (citing *Roberts v. Houston Cnty. Bd. of Educ.*, 819 F. Supp. 1019, 1029 (M.D. Ala. 1993), in which the district court found "[s]ubstantial irregularities or improprieties in a hiring process" to be "strong indicators of an improper, racial motive" for purposes of the defendant's failure to hire the plaintiff).  Plaintiff's argument that Brule's reason for replacing her is "vague" and "subjective" likewise lacks persuasiveness on its own.  *See Almodovar v. Cross Fin. Corp.*, No. 3:20-CV-01179 (JCH), 2022 WL 1810132, at *10 (D. Conn. June 2, 2022) (noting that the plaintiff did not point to any Second Circuit case law to support a similar argument and finding that "this factor is not sufficient, standing alone, to defeat summary judgment").

different "skill set."  Def.'s L.R. 56(a)2 St. ¶ 40.  The record suggests that Brule reiterated that Plaintiff did not have the skill set for the position during the meeting he and Sauchuk held with Plaintiff on September 8, 2020.  Sauchuk Dep. Tr. at 73:15–74:20; *see* Def.'s L.R. 56(a)2 St. ¶ 44. Moreover, according to Plaintiff's testimony, Sauchuk told her on September 3, 2020, that changes to the executive assistant position had nothing to do with her performance.  Pl.'s Dep. Tr., ECF No. 33-4, at 84:1–84:11.  Now, however, in his affidavit accompanying Defendant's motion, Brule raises several concerns about Plaintiff's job performance seemingly unrelated to her "skill set," including her lack of professionalism, receipt of personal packages in the office, and personal cell phone usage—issues Plaintiff disputes.  Brule Aff., ECF No. 29-4, ¶¶ 21–23; Pl.'s L.R. 56(a)2 St. ¶¶ 20–22; Pl.'s St. Add'l Facts ¶ 43.

Based on this evidence, viewed in the light most favorable to Plaintiff, the Court finds that there are genuine issues of fact material to whether Defendant's stated reason for replacing Plaintiff is pretext for retaliation.  To be sure, the ultimate burden of persuading the jury that she was retaliated against remains with Plaintiff, *see Reeves*, 530 U.S. at 143, and a reasonable jury could conclude that Plaintiff's removal from the executive assistant position had nothing to do with her FMLA leave.  For example, a jury could arrive at this conclusion if it finds that Brule and Sauchuk credibly testify that Brule had issues with Plaintiff's performance and intended to replace her before she requested FMLA leave.  Drawing all reasonable inferences in favor of Plaintiff, however, the Court cannot conclude that this is one of the rare occasions in which a plaintiff's *prima facie* case, combined with evidence of pretext, is insufficient to withstand summary judgment.  The record does not, for instance, "conclusively reveal[]"—through unrefuted contemporaneous documentation or other evidence—some other, nonretaliatory reason for Plaintiff's replacement; nor is there "abundant and uncontroverted independent evidence" that no

retaliation occurred.  *See id.* at 148.  A jury could certainly weigh Brule's knowledge of and prior work with Plaintiff's son as evidence supporting Defendant's contention that Brule did not retaliate against Plaintiff for taking FMLA leave to care for her son.  But this evidence would need to be weighed against Plaintiff's protestations concerning her alleged poor performance and the timing of Brule's notice to Plaintiff that he was seeking someone else for the position on her first day back from FLMA leave, among other things.  In short, when viewed in the light most favorable to Plaintiff, the record includes conflicting evidence regarding Plaintiff's performance and the true reason for her removal from the executive assistant position, rendering summary judgment inappropriate.

Importantly, the Second Circuit has held in the retaliation context that "a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment."  *Kwan*, 737 F.3d at 847 (italicization added).  Drawing all reasonable inferences in favor of Plaintiff, she has done so here, in a manner sufficient to raise a genuine issue of material fact as to the reason for her removal.  As a result, summary judgment is unwarranted as to this portion of Count One.

## IV. COUNT TWO:  INTERFERENCE WITH RIGHTS UNDER THE FMLA

The Court next grants summary judgment in favor of Defendant on Count Two, Plaintiff's claim that Defendant interfered with the exercise of her rights under the FMLA.

### A. Legal Standard

It is unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" rights under the FMLA.  29 U.S.C. § 2615(a)(1); *see* 29 C.F.R. § 825.220(a)(1) ("The FMLA prohibits interference with an employee's rights under the law, and with legal proceedings or inquiries relating to an employee's rights.").  Thus, an employee may seek relief

when her employer "has prevented or otherwise impeded [her] ability to exercise rights under the FMLA." *Woods*, 864 F.3d at 166.  To prevail on an interference claim, a plaintiff must establish: (i) that she was an eligible employee under the FMLA; (ii) that the defendant is an employer for purposes of the FMLA; (iii) that she was entitled to leave under the FMLA; (iv) that she gave notice to the defendant of her intention to take leave; and (v) that she was denied FMLA benefits to which she was entitled.  *Graziadio*, 817 F.3d at 424.

Interference with the exercise of FMLA rights may include, for example, "refusing to authorize FMLA leave" and "discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  Moreover, an employer's failure to "reinstate an employee to a prior position or its equivalent following FMLA leave" can constitute such interference.  *Wanamaker*, 11 F. Supp. 3d at 69; *see Blackett v. Whole Foods Mkt. Grp., Inc.*, No. 3:14-CV-01896 (JAM), 2017 WL 1138126, at *6 (D. Conn. Mar. 27, 2017) ("The right to reinstatement is 'a benefit at the crux of the FMLA's provisions,' and an employer who fails to reinstate an eligible employee may be liable for FMLA interference." (citation omitted)).  An equivalent position "is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions," and "it must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  *Wanamaker*, 11 F. Supp. 3d at 69–70 (internal quotation marks omitted).

For interference claims, "the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA."  *Id.* at 69.  Thus, an employer may be held liable for an interference claim "even if [it] never subjectively intended to interfere with [the] plaintiff's FMLA rights."  *Blackett*, 2017 WL 1138126, at *6.

B. Discussion

Defendant does not dispute that Plaintiff was an eligible employee under the FMLA, that the Town is an employer under the FMLA, that Plaintiff was entitled to take leave under the FMLA, or that Plaintiff gave notice of her intention to take such leave. Thus, the only issue in dispute as to Count Two is whether Plaintiff was denied FMLA benefits to which she was entitled. Defendant contends that Plaintiff was not denied any such benefits and, therefore, no genuine issues of material fact preclude the Court from finding for Defendant on this claim as a matter of law. For the reasons below, the Court agrees.

At the outset, Plaintiff does not contend that the Town denied any FMLA leave requests she made in 2020. Indeed, Plaintiff expressly concedes that the Town approved all such requests. Pl.'s L.R. 56(a)2 St. ¶ 39. Thus, to prevail on Count Two, Plaintiff must show that Defendant interfered with her FMLA rights in some manner other than by denying her leave. *Cf. Wanamaker*, 11 F. Supp. 3d at 69 (where there was no dispute that the plaintiff had received the twelve weeks of leave she requested, she could not "base her FMLA interference claim on a denial of leave").

Though she was not denied leave, Plaintiff claims Defendant interfered with the exercise of her FMLA rights by demoting her to the CSE position upon her return to work and therefore failing to reinstate her to her previous position or its equivalent. Specifically, Plaintiff argues that Brule informed her on the day she returned from leave that he intended to change the nature of her position and hire someone with a different skillset, and then—about four months later—Brule "followed through" and replaced her. ECF No. 33-1 at 25–26; *see* Pl.'s L.R. 56(a)2 St. ¶ 40. Plaintiff concedes, however, that she retained her position of executive assistant to the First Selectman when she returned to work on May 4, 2020, and that she stayed in that position until September of 2020. Pl.'s L.R. 56(a)2 St. ¶ 37. Accordingly, based on the present record, there is

no dispute that Plaintiff was reinstated to her position upon her return, and that she received all other benefits to which she was entitled under the FMLA.  Her interference claim, therefore, must fail.  *See Wanamaker*, 11 F. Supp. 3d at 69 (the issue for interference claims "is simply whether the employer provided the employee with the entitlements set forth in the FMLA").

Crucially, Plaintiff has presented no legal authority for the proposition that a reinstatement claim can arise under the FMLA where an employer reinstates a plaintiff to her prior position and then demotes her several months later.  Nor has she presented any legal authority for the proposition that an employer's discussion about replacing a plaintiff, without more, constitutes a failure to reinstate, even when the discussion occurs upon the plaintiff's return from FMLA leave. Notably, the FMLA does not provide that there are no circumstances under which an employer can remove an employee from her position upon her return from leave.  *See Hockenjos*, 2016 WL 2903269, at *7 ("[T]he FMLA explicitly permits an employer to terminate an employee at any time during his or her leave." (citing 29 C.F.R. § 825.216(a)(1))).  It is Plaintiff's obligation to present legal authority that would allow the Court to recognize her unconventional reinstatement theory.  She has not done so, which leaves the Court without a basis to stretch the scope of FMLA reinstatement claims to include Plaintiff's allegations in this case.[13]  Because Plaintiff concedes that she was reinstated to her prior position upon her return to work, and that she remained in that position for several months before she accepted a different position for Defendant, no genuine issues of material fact remain as to her interference claim.  Summary judgment is therefore appropriate on Count Two.

---

[13] The Court acknowledges that the effectiveness of reinstatement claims, in general, would be substantially weakened if an employer were permitted to evade the FMLA by, for example, reinstating a plaintiff for an extremely short period of time before terminating her.  But that is not what occurred here.

## V.      CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Court will convene a conference with the parties to set a trial date and deadlines for pretrial submissions with respect to Plaintiff's claim in Count One that Defendant retaliated against her by removing her from the executive assistant position after she returned from taking FMLA leave.


**SO ORDERED** at Hartford, Connecticut, this 31st day of March, 2023.


       */s/ Sarala V. Nagala*
       SARALA V. NAGALA
       UNITED STATES DISTRICT JUDGE